# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70947-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JAMES E. HAGER, | ) | |
| Appellant. | ) | FILED: March 2, 2015 |

TRICKEY, J. — James Hager appeals his conviction for second degree burglary. He contends that the trial court abused its discretion in admitting evidence of a similar incident under ER 404(b), and that the evidence was insufficient to show he entered or remained in a building with the intent to commit a crime. Finding no error, we affirm.

## FACTS

In 2002, Marcus Swenson purchased a piece of rural property in Skykomish, Washington. The property, located "way out in the woods," is reachable only by a forest service road and two sets of locked gates.[1] Only Swenson, the two adjacent property owners, and the power company possessed keys to the gates. Present on the property at the time Swenson purchased it was a "connex box," a large metal shipping container.[2] Finding it to be "a good storage container," Swenson cleaned out the container, which contained "[a] lot of junk . . . random bits of automotive hardware," and put his own belongings inside, including a cast iron woodstove, a double-insulated steel stovepipe, and a disassembled cedar hot tub.[3] He kept the container locked with a padlock. Swenson also constructed a yurt and two small outbuildings on the property.

---

[1] Report of Proceedings (RP) (Aug. 8, 2013) at 28, 112.
[2] RP (Aug. 8, 2013) at 35-36, 141-42.
[3] RP (Aug. 8, 2013) at 37-47, 63.

Swenson lived in Seattle and went out to the property every two to six weeks. On May 11, 2012, Swenson and his family arrived and noticed that the electricity powering the yurt was not working, there were deep ruts leading to the container, the padlock was missing, and the woodstove, stovepipe, and pieces of the hot tub were gone.[4] Swenson's security camera footage from May 4, 2012 showed a large truck and trailer entering the property and leaving with his items.

On May 16, 2012, a King County Sheriff's deputy saw the same truck and pulled it over. Hager, who at the time was a law enforcement officer for the city of Gold Bar, was driving. Hager admitted he had taken the missing items. He claimed he had done so on request from a man named Donald Anderson, who Hager claimed owned the property. The State ultimately charged Hager with one count of second degree burglary.

At trial, the State sought to introduce evidence of three other acts pursuant to ER 404(b). The first was Hager's admission to detectives that he suffered from a substance abuse problem and participated in a treatment program around the time of the incident at the Swenson property. The second involved a raid on a "chop-shop" operation on John Tharp's property that Hager participated in on May 23, 2012.[5] Hager returned to Tharp's property after dark that evening and removed a stolen utility trailer. Instead of returning the trailer to the victim, Hager towed it to a defunct lumber mill owned by his friend Richard Wagner. The third involved an incident on May 19, 2012 in which Hager, Wagner, and a third man went onto the property of John Fernald without permission. The trial court ruled that the State could not introduce evidence of drug use or the Tharp property incident. However, the trial court allowed testimony regarding the Fernald property incident as follows:

---

[4] RP (Aug. 8, 2013) at 38-45.
[5] Clerk's Papers (CP) at 108-09; RP (Aug. 13, 2013) at 170.

2

In terms of the Fernald incident, this involves a trespass with permission sought later. There is probative value as to these allegations in the instant case in terms of absence of mistake. In looking at the probative value versus the prejudicial effect, the Court doesn't believe the State is allowed more leeway, just because the defendant is a police officer or that the case law allows admission for context, but I do believe there is a – there is proof here for absence of mistake in terms of the trespass and the permission being sought later. There is obvious prejudicial effect, but I do find that the probative value outweighs the prejudicial effect. I will allow the Fernald incident to be admitted and the Court will attempt to deal with the prejudicial effect by limiting the State somewhat in the amount that can be admitted as to this incident. I will allow the State to admit the evidence as to the defendant's actions only and I would exclude the actions of the associates or companion in the barn in terms of moving Ms. Kohler's property and I believe the testimony is taking her glasses. So I will exclude what the associates are alleged to have done and limit to the actions the State can link up to the defendant itself.[6]

Four witnesses testified regarding the Fernald property incident: Fernald, Gerald Reule, Teresa Kohler, and Detective Brad Williams. Fernald testified that he had moved to Nevada and left his property unoccupied. Fernald gave Reule, Kohler, and another man, Bill Cross, permission to access the property. Fernald had previously met Hager when some items were stolen from his property in August 2011 and Hager came out to take a report. Fernald did not give Hager permission to go on his property at any future time.

Reule testified that in May 2012, the gate leading to the Fernald property was locked with a key lock and only he, Kohler, and Cross had keys. Reule also did not give Hager permission to go on the property in a civilian capacity.

Kohler testified that she was on the property on May 19, 2012, when she saw a white truck pulling a flatbed trailer. She was frightened because she did not recognize the truck, and hid in some blackberry bushes. Kohler eventually made her way back to her car. Her car's hood was raised, her sparkplugs and registration were missing, and

---

[6] RP (Aug. 7, 2013) at 67-68.

on the windshield was a note that said, "Come see me for registration and etcetera. Jim Hager. I'm up top."[7] Kohler walked to the main road and called 911. When Kohler returned to her car, Hager was standing next to it. Hager told Kohler that he was friends with Fernald and had Fernald's permission to be there. The next day, May 20, Hager called Fernald and asked permission to go onto Fernald's property to hunt a bear.

Detective Williams testified that he investigated Hager's entry onto the Fernald property. Hager told Detective Williams that Fernald gave him permission to be on the property and Reule had given him the combination to a padlock on the gate. Following the incident, Hager called Fernald and asked him "to call his department and clear it up."[8]

Hager testified that, as part of his role as a police officer, he was helping an elderly man named Bill Pearson evict Donald Anderson, an unwanted tenant. Hager stated that Anderson told him that he owned the Swenson property and needed to retrieve some belongings from it before he could move. He claimed that Anderson drew him a map to reach the property. Anderson did not specify what property he allegedly wanted and Hager did not ask. Nor did Anderson give Hager the keys to the gates or the container. Hager testified that he drove to the Swenson property and used a power company key he had gotten from "a buddy of mine" to open the gates.[9] He cut the lock on the container with bolt cutters and gathered some items he assumed Anderson wanted. He stated that he attempted to contact Anderson to drop off the items, could not find Anderson, and decided to leave the items under a tarp at his own house. Regarding the Fernald property, he claimed that Reule invited him up to the Fernald property to camp and hunt a bear.

---

[7] RP (Aug. 12, 2013) at 32.
[8] RP (Aug. 12, 2013) at 163.
[9] RP (Aug. 13, 2013) at 147.

Anderson denied telling Hager to retrieve items for him or drawing Hager a map. He testified that sometime after the incident on the Swenson property Hager came out to his house late at night and "asked if I would say if he—I gave him permission."[10] Tharp, on whose property Anderson was living at the time, witnessed Hager, in civilian clothes, talking to Anderson between 2:00 and 3:00 a.m. on May 24, 2012.

The State proposed, and the trial court gave, the following instruction as Jury Instruction 7: "Building, in addition to its ordinary meaning, includes any dwelling or fenced area."[11] A jury convicted Hager as charged. Hager appeals.

ANALYSIS

*ER 404(b) Evidence*

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But such evidence may be admissible for other purposes, such as to show "absence of mistake or accident." ER 404(b). In order to admit evidence under ER 404(b), the trial court must "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). We review a trial court's ruling on the admissibility of ER 404(b) evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). Abuse of discretion is shown only when a trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons. Magers, 164 Wn.2d at 181.

---

[10] RP (Aug. 8, 2013) at 160.
[11] CP at 54, 119.

Hager contends the trial court erred in admitting evidence of the Fernald property incident because it was not relevant to show absence of mistake or accident. He argues that because he did not actually remove anything from the Fernald property, it was not analogous to the incident on the Swenson property. But Hager's defense to the burglary was that he *believed he had permission to be there*. Likewise, Hager's explanation regarding the Fernald property incident was that he *believed he had permission to be there*. There were other marked similarities between the two incidents: (1) Hager entered properties that he knew to be remote and unoccupied; (2) the owners denied giving Hager permission to go onto the properties at will or giving him keys he would need to open locked gates; (3) Hager attempted to seek permission after being confronted by law enforcement; and (4) Hager used his status as a law enforcement officer to justify his actions. The record reveals that the trial court carefully considered Hager's arguments and thoroughly described its reasoning in admitting the evidence. The trial court also limited the testimony to Hager's actions only and not those of his companions. Because the evidence of the Fernald incident tended to negate Hager's claim that he went onto the Swenson property and removed items by mistake, the trial court did not abuse its discretion in admitting it for that purpose.

Hager argues that even if evidence of the incident was admissible, the trial court should have prevented the State from eliciting certain details he claims are more prejudicial than probative. Specifically, Hager cites (1) Detective Williams' testimony that the Fernald property contained pieces of metal and equipment that could be taken to a scrapyard and sold for money, and that Detective Williams later ran into Hager at Loth Lumber, a "multipurpose"[12] site that housed large pieces of metal; and (2) Kohler's

---

[12] RP (Aug. 12, 2013) at 153.

testimony that she was frightened and hid from Hager and that Hager removed her sparkplugs and registration from her car. But the evidence regarding the value of scrap metal was probative to the issue of Hager's intent in going onto the properties. Additionally, because another detective had already testified as to the market for scrap metal, the evidence was, at most, cumulative. Kohler testified that she was frightened because she did not recognize Hager's truck, demonstrating that Hager did not have permission to be on the Fernald property. And Kohler's testimony that Hager left a note on her car established Hager's presence and identity. The probative value of this evidence outweighed any prejudice to Hager.

*Sufficiency of the Evidence: "Building"*

A person commits burglary in the second degree when, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a "building." RCW 9A.52.030(1). Hager contends that the State's evidence was insufficient to show that he entered a "building" as defined in Jury Instruction 7.

Jury Instruction 7 instructed the jury that "[b]uilding, in addition to its ordinary meaning, includes any dwelling or fenced area." Hager argues that because the State offered no evidence he entered a "dwelling" or "fenced area," the State was required to prove that what Hager entered fell within the "ordinary meaning" of "building." Hager argues that the shipping container is not a building within the ordinary meaning of the term. Hager points to RCW 9A.04.100(5), which provides the following definition for "building":

> "Building," *in addition to its ordinary meaning*, includes any dwelling, fenced area, vehicle, railway car, *cargo container*, or any other structure used for lodging of persons or for carrying on business therein, or for the use, sale or deposit of goods.

7

(Emphasis added). Because RCW 9A.04.100(5) specifies that a "cargo container" is an example of a type of building "in addition to its ordinary meaning," Hager argues, a "cargo container" cannot also be a building within the ordinary meaning of the term.

The meaning of a statutory definition is an issue of law we review de novo. State v. Johnson, 132 Wn. App. 400, 406, 132 P.3d 737 (2006). Whether the evidence at trial meets that definition is a factual question we review for sufficiency of the evidence. Johnson, 132 Wn. App. at 406. Sufficient evidence supports a jury's verdict if a rational person viewing the evidence in the light most favorable to the State could find each element proven beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences from the evidence in the State's favor and interpret them most strongly against the defendant. Salinas, 119 Wn.2d at 201.

"Cargo container" is not defined by statute. When a statutory term is undefined, we may look to a dictionary definition or related provisions to determine its meaning. Woodbury v. City of Seattle, 172 Wn. App. 747, 750, 292 P.3d 134, review denied, 177 Wn.2d 1018, 304 P.3d 114 (2013) . We also consider the context of the statute in which the provision is found. Woodbury, 172 Wn. App. at 750.

The dictionary defines "cargo" as "the lading or freight of a ship, airplane, or vehicle: the goods, merchandise, or whatever is conveyed," and "container" as "a receptacle (as a box or jar) or a formed or flexible covering for the packing or shipment of articles, goods, or commodities . . . a portable usu. metal compartment in which freight is placed for convenience of movement esp. on railroad container cars." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 339, 491 (1993). WAC 296-56-60005 also provides some guidance, defining "[i]ntermodal container" as "a reusable cargo container of rigid construction and rectangular configuration intended to contain one or more articles of

cargo or bulk commodities for transportation by water and one or more other transport modes without intermediate cargo handling."

"Building," on the other hand, is defined as "[a] constructed edifice designed to stand more or less permanently, covering a space of land, usu. covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 292 (1993).

The shipping container on the Swenson property was not being used to transport goods. It had been on the property for more than ten years, lodged in a heavily wooded area, and had consistently been used as a storage shed for the owner's personal items. Both the dictionary definitions and WAC 296-56-60005 support our conclusion that the structure Hager entered was a "building," within the ordinary meaning of the term, and not a "cargo container."

This conclusion is consistent with the only published case involving burglary of a cargo container. In State v. Tyson, 33 Wn. App. 859, 860-61, 658 P.2d 55 (1983), the defendant was convicted of second degree burglary involving a "loaded cargo trailer" at the Delta Truck Lines freight terminal that "had just arrived from California and was awaiting unloading. It was still attached to the truck tractor which had hauled it [to Washington]." The court held that such a structure was a "cargo container."

> In the present case, the uncontroverted testimony at trial established that the semitrailer, which had been broken into and entered, was a separate detachable container or structure from the truck tractor unit which was used to draw it, and was strictly a cargo trailer used for general freight. It was also, at the time of the unlawful entry, parked in the freight yard over a weekend awaiting the unloading of its cargo. Such evidence together with

the reasonable inferences drawn therefrom was sufficient to convince any rational trier of fact beyond doubt that the trailer was either a cargo container or other structure used for the deposit of goods and thus was encompassed within the unique statutory definition of "building" for purposes of burglary in the second degree.

Tyson, 33 Wn. App. at 863 (footnotes and citations omitted).

Because Hager admitted he entered the shipping container and removed Swenson's items, the evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that Hager entered a building.

*Sufficiency of the Evidence: Intent*

Finally, Hager argues that the State failed to present sufficient evidence that he entered the Swenson property with the intent to commit a crime, one of the elements of second degree burglary.[13] We disagree.

"In any prosecution for burglary, any person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein, unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent." RCW 9A.52.040. The intent to commit a crime may also be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability. State v. Woods, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury on issues of conflicting testimony, credibility

---

[13] Hager contends that the State conceded this argument because it failed to specifically address it in its response brief. But we need not decide whether the State's omission constituted a concession, because even if it did, we would decline to accept it. See In re Pers. Restraint of Goodwin, 146 Wn.2d 861, 875, 50 P.3d 618 (2002) (appellate court not bound by erroneous concession of legal error).

of witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Here, the State presented sufficient evidence from which the jury could infer that Hager intended to commit a crime. Hager entered the Swenson property without permission, using a power company key to open the gates, and bolt cutters to open the lock on the shipping container. He then removed several items and took them to his own home where he placed them under a tarp. Though Hager argues that his presence on the Swenson property was merely the result of a misunderstanding and he did not intend to deprive anyone of their property, this explanation was clearly not persuasive to the jury. Sufficient evidence supports the conviction for second degree burglary.

Affirmed.

_Trickey, J_

WE CONCUR:

_Leach, J._        _Appelwick_